

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 MAR -2  AM II: 04

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MONNIE GREER, ET AL. | * | CIVIL ACTION NO. |
| | * | 05 - 0682 |
| | * | |
| VERSUS | * | SECTION: |
| | * | SECT. MAG. 1 |
| DENBURY RESOURCES, INC. AND | * | |
| GARETH ROBERTS | * | MAGISTRATE: |
| * * * * * * * * * * * * * * * * * * * * * * * | | |

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441, 1446, and 1332, defendants Denbury Resources,

Inc. ("Denbury") and Gareth Roberts hereby remove this action from the Civil District

Court for the Parish of Orleans, State of Louisiana to the United States District Court for

the Eastern District of Louisiana and represent as follows:

1.

On February 11, 2005, plaintiffs commenced their action against the defendants in

the Civil District Court for the Parish of Orleans, State of Louisiana in Case No. 2005-

1952 which was entitled "Monnie Greer et al. versus Denbury Resources, Inc. and Gareth

Roberts."



2.

The amount in controversy in this matter is in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between all of the plaintiffs and all of the defendants. Thus, there is original jurisdiction over this matter under 28 U.S.C. §1332 and this case may be removed pursuant to 28 U.S.C. §1441.

3.

Plaintiffs including plaintiff Alice Caminita are all domiciled in and all citizens of the State of Louisiana, both as of the date that the suit was filed (February 11, 2005) and as of the date of the filing of this Notice of Removal (March 2, 2005). Defendant Gareth Roberts is domiciled in and is a citizen of Texas. Defendant Denbury Resources, Inc. is a citizen of Texas where its principal place of business is located as well as a citizen of Delaware which is its state of incorporation.

4.

A person's domicile for purposes of federal jurisdiction based on diversity of citizenship is the place of "his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent there from...." *Brown v. Mutual of New York Life Ins. Co.,* 213 F.Supp. 2d 667, 669 (S.D. Miss. 2002), *quoting Mas. v. Perry,* 489 F.2d 1396, 1399 (5th Cir.) *cert. den.* 419 U.S. 842 (1974). "There is a presumption in favor of the continuing domicile which requires the party seeking to show a change in domicile to come forward with enough evidence to that effect to withstand a directed verdict." *Coury v. Prot,* 85 F.3d 244, 250 (5th Cir. 1996); *Brown,* 213 F.Supp. 2d at 669.

5.

Plaintiff, Alice Caminita, has been domiciled and a citizen of Louisiana for many years and has not changed her domicile to another state. For example, at the time of the filing of both the Petition and the Notice of Removal of this case, Ms. Caminita continued to reside in Louisiana in her home, was registered to vote in Louisiana, had a Louisiana driver's license, and had her car registered in Louisiana.

6.

Moreover, if there is any challenge to this removal and whether there is federal jurisdiction, this Court in making its "jurisdictional assessment" is not limited to the pleadings and "may look to any record evidence, and may receive affidavits, deposition testimony, or live testimony concerning the facts underlying the citizenship of the parties." *Coury*, 85 F.3d at 249; *Brown*, 213 F.Supp. 2d at 669, n. 1.

7.

This Notice of Removal is filed within thirty days after receipt by defendants, through service or otherwise, with a copy of the initial pleading (the "Petition for Damages") setting forth the claim for relief and therefore is timely. *See* U.S.C. §1446(b). A copy of the "Petition for Damages" filed by the plaintiffs in this matter has not yet been formally served on either defendant, but rather it was received by defendant Gareth Roberts by federal express delivery on February 14, 2005.

8.

Attached hereto as Exhibit A is a certified true copy of the "Petition for Damages" and exhibits thereto in this matter which are all the "process, pleadings, and orders" on file with the state court in this matter and also which were received by either defendant.

The defendants have not yet been formally served with any "process, pleadings, and orders" in this matter.

9.

The defendants certify that written notice of the filing of this Notice of Removal will be promptly given to plaintiffs and filed with the Clerk of Court of the Civil District Court, Orleans Parish, State of Louisiana.

WHEREFORE, defendant Denbury Resources, Inc. and Gareth Roberts respectfully request that this Notice of Removal be accepted as good and sufficient and that the action entitled "Monnie Greer, et al. v. Denbury Resources, Inc. and Gareth Roberts" with Case No. 2005-1952 in the Civil District Court, Parish of Orleans, State of Louisiana, be removed to the United States District Court for the Eastern District of Louisiana, and that this Court enter all orders and issue all process necessary to proceed with this action as if originally commenced in this Court.

LEMLE & KELLEHER, L.L.P.

By: _____
    Alan H. Goodman, (#6131)
    Thomas M. Benjamin (#18562)
    601 Poydras Street
    2100 Pan-American Life Center
    New Orleans, LA 70130
    Telephone: (504) 586-1241

    Attorneys for Defendants, Denbury
    Resources, Inc. and Gareth Roberts

556365-1                        4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing pleading was served upon opposing counsel by placing same in the United States mails, postage prepaid and properly addressed, on this 2nd day of March 2005.

CIVIL JUDICIAL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO: 2005- 1952          SECTION 10   Div.:

MONNIE GREER, KEVIN JORDAN, STEVE FREEMAN, GIA LEPERE,
STEVEN C. WHITEHURST, BERNARD HAGSTETTE, WILLARD POWELL,
FRANK W. CURROW, JR., FRANK CAPONEGRO, EDWARD M. SCHEHR, JR.,
THOMAS BATH, ALICE CAMINITA

Versus

DENBURY RESOURCES, INC.,

GARETH ROBERTS

Filed: _____          _____

Deputy Clerk

**PETITION FOR DAMAGES**

NOW INTO COURT, through undersigned counsel, come the plaintiffs, former

employees of Denbury Offshore, Inc., who as their Petition for Damages, respectfully represent:

**NATURE OF THE LAWSUIT**

1.

Former employees of Denbury Offshore, Inc. ("Denbury Offshore") bring this lawsuit

against the above-named defendants to recover the value of stock options that were part of the

employees' compensation package.  Denbury Resources, Inc., a defendant, owned (at times

directly and at times through an affiliate) Denbury Offshore from July 2001 through July 2004.

Headquartered in St. Tammany Parish, Louisiana, Denbury Offshore engaged in the business of

finding and producing oil and gas in the Gulf of Mexico.  Because the defendants lacked the

necessary expertise in the offshore oil and gas industry, the defendants hired the plaintiffs to

manage the Denbury Offshore operations, with the understanding that a substantial portion of the

plaintiffs' compensation would be in the form of stock options that would allow the plaintiffs to

share in the profits of Denbury Offshore.  Under the subsequent careful and competent

management of the plaintiffs, Denbury Offshore prospered during the three years that Denbury

Resources, Inc. owned it.  The defendants sold Denbury Offshore in the summer of 2004.  In all,

Denbury Offshore enriched the defendants by more than $100 million. Before entering into an

agreement to sell Denbury Offshore, the defendants retired the plaintiffs' When refused to

VERIFIED
Rick Cosgriff
Deputy Clerk

EXHIBIT

A

honor their obligations to vest the plaintiffs' stock options. Within a month of selling Denbury Offshore, twelve directors and officers of Denbury Resources, Inc.– the very people who refused to honor the plaintiffs' stock options –awarded themselves over $23 million in Denbury Resources, Inc. stock grants. Sheer corporate greed motivated the defendants' actions.

## THE PARTIES

2.

Made defendant herein is Denbury Resources, Inc., a Delaware corporation (hereinafter, "New Denbury"), headquartered at 5100 Tennyson Parkway, Suite 3000, Plano, Texas 75024-4932.

3.

Made defendant herein is Gareth Roberts, a person of the age of majority and a resident of Texas. Mr. Roberts is the Chief Executive Officer of Denbury Resources, Inc., and held that position at all material times stated herein.

4.

Monnie Greer is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From July 10, 2001 through April 15, 2004, Ms. Greer worked as a reservoir engineer for Denbury Offshore. As part of her compensation, Ms. Greer received options to acquire 35,545 shares of common stock of Denbury Resources, Inc., of which options to acquire 25,295 shares, with an average exercise price of $9.90 per share, remained outstanding when the defendants laid off Ms. Greer in connection with the sale of Denbury Offshore.

5.

Kevin Jordan is a person of the age of majority and a resident of Orleans Parish, Louisiana. From June 1, 2003 until March 10, 2004, Mr. Jordan worked as an oil scout for Denbury Offshore. As part of his compensation, Mr. Jordan received options to acquire 5,650 shares of common stock of Denbury Resources, Inc. at an average exercise price of $11.96 per share. The defendants laid off Mr. Jordan in connection with the sale of Denbury Offshore.

6.

Steve Freeman is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From July 10, 2001 through July 20, 2004, Mr. Freeman worked as a production engineer for Denbury Offshore. As part of his compensation, Mr. Freeman received options to acquire 33,429 shares of common stock of Denbury Resources, Inc., of which options to acquire

2

19,029 shares, with an average exercise price of $10.18 per share, remained outstanding when the defendants laid off Mr. Freeman in connection with the sale of Denbury Offshore.

7.

Gia LePere is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From July 10, 2001 through July 20, 2004, Ms. LePere worked as a regulatory specialist for Denbury Offshore. As part of her compensation, Ms. LePere received options to acquire 4,245 shares of common stock of Denbury Resources, Inc., of which options to acquire 3,449 shares, with an average exercise price of $10.51 per share, remained outstanding when the defendants laid off Ms. LePere in connection with the sale of Denbury Offshore.

8.

Steven C. Whitehurst is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From July 10, 2001 through July 20, 2004, Mr. Whitehurst worked as a production engineer for Denbury Offshore. As part of his compensation, Mr. Whitehurst received options to acquire 33,682 shares of common stock of Denbury Resources, Inc., of which options to acquire 19,282 shares, with an average exercise price of $10.21 per share, remained outstanding when the defendants laid off Mr. Whitehurst in connection with the sale of Denbury Offshore.

9.

Bernard Hagstette is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From October 11, 2001 through July 20, 2004, Mr. Hagstette worked as a purchasing manager for Denbury Offshore. As part of his compensation, Mr. Hagstette received options to acquire 20,091 shares of common stock of Denbury Resources, Inc., of which options to acquire 13, 591 shares, with an average exercise price of $10.02 per share, remained outstanding when the defendants laid off Mr. Hagstette in connection with the sale of Denbury Offshore.

10.

Willard Powell is a person of the age of majority and a resident of Washington Parish, Louisiana. From July 10, 2001 through March 31, 2004, Mr. Powell worked as a geologist for Denbury Offshore. As part of his compensation, Mr. Powell received options to acquire 45,819 shares of common stock of Denbury Resources, Inc., of which options to acquire 34,319 shares,

3

with an average exercise price of $9.99 per share, remained outstanding when the defendants laid off Mr. Powell in connection with the sale of Denbury Offshore.

11.

Frank W. Currow, Jr. is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From September 15, 2001 through March 10, 2004, Mr. Currow worked as a senior geophysicist for Denbury Offshore. As part of his compensation, Mr. Currow received options to acquire 35,122 shares of common stock of Denbury Resources, Inc., of which options to acquire 23,872 shares, with an average exercise price of $10.24 per share, remained outstanding when the defendants laid off Mr. Currow in connection with the sale of Denbury Offshore.

12.

Frank Caponegro is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From July 10, 2001 through May 31, 2004, Mr. Caponegro worked as a senior reservoir engineer for Denbury Offshore. As part of his compensation, Mr. Caponegro received options to acquire 31,447 shares of common stock of Denbury Resources, Inc., of which options to acquire 21,697 shares, with an average exercise price of $10.24 per share, remained outstanding when the defendants laid off Mr. Caponegro in connection with the sale of Denbury Offshore.

13.

Edward M. Schehr, Jr. is a person of the age of majority and a resident of Jefferson Parish, Louisiana. From September 15, 2001 through March 10, 2004, Mr. Schehr worked as a petroleum geologist for Denbury Offshore. As part of his compensation, Mr. Schehr received options to acquire 32,908 shares of common stock of Denbury Resources, Inc., of which options to acquire 22,408 shares, with an average exercise price of $10.26 per share, remained outstanding when the defendants laid off Mr. Schehr in connection with the sale of Denbury Offshore.

14.

Thomas Bath is a person of the age of majority and a resident of St. Tammany Parish, Louisiana. From July 10, 2001 through March 10, 2004, Mr. Bath worked as a geological consultant for Denbury Offshore. As part of his compensation, Mr. Bath received options to acquire 29,128 shares of common stock of Denbury Resources, Inc., of which options to acquire

4

20,128 shares, with an average exercise price of $10.25 per share, remained outstanding when the defendants laid off Mr. Bath in connection with the sale of Denbury Offshore.

15.

Alice Caminita is a person of the age of majority and a resident of Harris County, Texas. From January 1, 2002 through July 20, 2004, Ms. Caminita worked as an assistant engineering technician/records clerk for Denbury Offshore.   As part of her compensation, Ms. Caminita received options to acquire 1,265 shares of common stock of Denbury Resources, Inc., of which options to acquire 1,135 shares, with an average exercise price of $11.83 per share, remained outstanding when the defendants laid off Ms. Caminita in connection with the sale of Denbury Offshore.

## JURISDICTION AND VENUE

16.

Although New Denbury has failed to register to do business in the State of Louisiana, New Denbury, both directly and through its operating subsidiaries, transacts business in Louisiana.  Among other things, in the course and scope of their employment, New Denbury corporate officers regularly frequent the state of Louisiana to oversee and manage the work of New Denbury's subsidiaries that maintain offices in Louisiana.  Among those corporate officers are or have been Gareth Roberts (President and Chief Executive Officer), Mark Worthey (Senior Vice President – Operations), Mark Allen (Chief Accounting Officer), Harold (Ray) Dubuisson (Vice President – Land), Tracy Evans (Vice President – Reservoir), Phil Rykhock (Senior Vice President and Chief Financial Officer) and Jim Sinclair (Vice President – Exploration). Operations located in or operated from Louisiana generate a substantial amount of the consolidated revenue and income of New Denbury and its predecessor company (also Denbury Resources, Inc. and hereinafter, "Old Denbury"), and did so during the years 2001 through 2004.

17.

Mr. Roberts frequently comes to Louisiana to transact business, and he did so during the years 2001 through 2004.  For example, Mr. Roberts came to Louisiana in 2001 to entice some of the plaintiffs to accept Old Denbury Stock Options as part of their compensation.

18.

In December 2003, Old Denbury formed a new company, New Denbury, to carry on Old Denbury's name and business.  Then, the board of directors of Old Denbury, including Mr.

5

Roberts, approved a transaction whereby Old Denbury was merged into one of its indirect subsidiaries, a company named Denbury Onshore, LLC.  In this "Reorganization Transaction," Old Denbury (now merged into Denbury Onshore, LLC) became an indirect subsidiary of New Denbury.  Old Denbury was a company registered to do, and that actually did, business in Louisiana.  New Denbury essentially transacts the same business that Old Denbury transacted prior to December 2003, but New Denbury apparently failed to register to do business in this State.

19.

Given the frequent presence of its corporate officers in Louisiana dding business in the course and scope of their employment, New Denbury is subject to personal jurisdiction in the state courts of Louisiana.

20.

Given his frequent presence in Louisiana and the contacts he had with the plaintiffs in Louisiana, Mr. Roberts has subjected himself to the personal jurisdiction of the state courts of Louisiana.

21.

New Denbury committed acts and omissions that have caused damage in Louisiana, including without limitation damage to Mr. Jordan, a resident of Orleans Parish.

22.

Mr. Roberts committed acts and omissions that have caused damage in Louisiana, including damage to Mr. Jordan, a resident of Orleans Parish.

23.

Accordingly, pursuant to La. Rev. Stat. § 13:3203 (2004) and La. Code Civ. Proc. art. 42 (2004), venue is proper in the Civil District Court in Orleans Parish, and this court has personal jurisdiction over both New Denbury and Mr. Roberts.

## FACTS

### OLD DENBURY ACQUIRES MATRIX OIL & GAS COMPANY

24.

On July 10, 2001, Old Denbury purchased Matrix Oil & Gas Company, a company headquartered in Covington, Louisiana ("Matrix"), for $158 million.  Matrix was in the business

6

of exploring and developing oil and gas properties in the Gulf of Mexico.  At acquisition, Old Denbury renamed Matrix "Denbury Offshore, Inc."

25.

On July 10, 2001, Old Denbury's common stock was traded on the New York Stock Exchange.  Old Denbury acquired Matrix to enhance the value of Old Denbury's common stock.

26.

At the time that Old Denbury acquired Matrix, Old Denbury lacked employees with the necessary levels of experience and knowledge to conduct offshore exploration and development operations on a large scale, or to manage production platforms in the Gulf of Mexico.  To make the acquisition a success, Old Denbury needed to retain the management and employees of Matrix.

27.

Old Denbury was aware that the Matrix employees were extremely competent and experienced in offshore petroleum operations.  Therefore, if Old Denbury failed to hire the Matrix employees, the employees would likely be competitors of Old Denbury going forward.  Thus, Old Denbury sought to hire the Matrix employees both to manage Old Denbury's new venture and to avoid competition.

28.

In order to secure the continued services of Matrix's employees, defendant Gareth Roberts traveled to Covington, Louisiana to meet with the Matrix employees prior to the acquisition of Matrix by Old Denbury.

29.

The meeting between Mr. Roberts and the Matrix employees went well.  Mr. Roberts convinced many Matrix employees, including some of the plaintiffs, that Old Denbury was acquiring Matrix with the intent to own and grow its business on an on-going basis and that Old Denbury was committed to the long-term success of the offshore business.  Ultimately, Mr. Roberts and Old Denbury persuaded enough Matrix employees to remain with the company after Old Denbury acquired it.  This meeting established the groundwork for a relationship of trust and confidence between Old Denbury and the Matrix employees who were to become Denbury Offshore employees after the acquisition.

7

<u>**OLD DENBURY USES STOCK OPTIONS TO ATTRACT, RETAIN AND PAY THE PLAINTIFFS**</u>

30.

At this first meeting with the employees of Matrix prior to the acquisition date, Mr. Roberts informed the employees that Old Denbury had a stock option plan. A copy of the Old Denbury Stock Option Plan is attached as **Exhibit A** to this Petition for Damages.

31.

The Old Denbury Stock Option Plan was designed for the following purposes: (1) to help Old Denbury attract employees; (2) to retain employees who proved to be competent and hard-working; (3) to motivate employees to work hard and long hours; (4) to lower the threat of competition to Old Denbury by providing potential business competitors with an incentive not to compete; and (5) to lower Old Denbury's operating costs by giving employees stock options in lieu of cash salary.

32.

When Mr. Roberts first addressed the Matrix employees, he explained that after the acquisition a significant portion of their salary would be paid in the form of stock options. Each employee would receive options on the date of the acquisition and, additionally, would receive options each year as part of his or her compensation for the year.

33.

Mr. Roberts explained that the stock options were "incentive stock options," meaning that the employees would not only benefit from the fact that the stock options were not taxed when granted, but also would not be taxed when exercised. Thus, being paid through incentive stock options saved an employee substantial federal and state taxes. The fact that the options were tax advantaged was an attractive feature for the Matrix employees.

34.

Mr. Roberts informed the Matrix employees that, under the Old Denbury Stock Option Plan, options normally vested four years after the date the options were granted. He explained, however, that a special exception was made for options granted on the date that a person started employment by Denbury Offshore. These initial option grants would vest in equal 25% increments on the four anniversary dates following the date of grant.

8

35.

From time to time, the management of Old Denbury, including defendant Mr. Roberts, represented to the plaintiffs that, although the stock options did not vest for four years under normal circumstances, if Denbury Offshore were ever sold, the stock options would vest in full. Other plaintiffs understood that their stock options had real value and if Denbury Offshore were sold, their options would automatically vest. In particular, Old Denbury made these representations when:

- Mr. Evans, during employment negotiations in 2001, explained to Mr. Caponegro that if Denbury Offshore were ever sold, Mr. Caponegro would be allowed to exercise all of his options in order to realize the results of his work building the value of Denbury Offshore.

- Defendant Mr. Roberts and Mr. Sinclair, Exploration Manager of Old Denbury, informed plaintiff Mr. Powell during employment negotiations in 2001 that if Denbury Offshore were ever sold, Mr. Powell would not lose his unvested options, and would be allowed to exercise all of his options in order to realize the results of his work building the value of Denbury Offshore.

- Mr. Mark Worthey, Vice President of Operations of Old Denbury, told Steven Whitehurst in 2001 during employment negotiations associated with the purchase of Matrix by Old Denbury, that if Denbury Offshore were ever sold, Mr. Whitehurst would be allowed to exercise all of his options to realize the results of his work building the value of Denbury Offshore.

- Mr. Worthey told Bernard Hagstette during employment negotiations in 2001 that if the Denbury Offshore were ever sold, Mr. Hagstette would not lose his unvested options and would be allowed to exercise all of his options in order to realize the results of his work building the value of Denbury Offshore.

- Mr. Evans, Vice President of Engineering of Old Denbury, told Monnie Greer during employment negotiations that if Denbury Offshore were ever sold, Ms. Greer would not lose her unvested options, and would be allowed to exercise all of her options in order to realize the results of her work building the value of Denbury Offshore.

-

36.

Thus, Mr. Roberts, the CEO of Old Denbury (and a member of the Old Denbury Board of Directors), conveyed to the Matrix employees that the stock options they would receive over the coming years in lieu of part of their salary would have real economic value. Mr. Roberts and other representatives of Old Denbury, acting with the apparent authority implicit in their positions, led the employees of Denbury Offshore to believe that the only way an employee would not recognize value from his or her stock options would be if he or she voluntarily left the employ of Denbury Offshore or were terminated for cause prior to the vesting date of the options.

37.

On the date of its acquisition of Matrix, Old Denbury changed the name of Matrix Oil & Gas Company to Denbury Offshore, Inc. Every new employee received stock options as compensation for work to be done during the remainder of 2001. Each of the employees received a grant letter in substantially the same form (hereinafter the "Initial Grant Form"), setting out the number of shares subject to his or her stock option and the exercise price of the option. A copy of the Initial Grant Form is attached to this petition as **Exhibit B**.

38.

The cash compensation that Old Denbury paid to the plaintiffs was well below the cash salary that other employers or direct competitors of Denbury Offshore would have paid them. The cash compensation that Old Denbury paid the plaintiffs was below the amount that the plaintiffs could have earned as direct competitors of Old Denbury. The difference in value was supposed to be made up in the Old Denbury stock options that every Denbury Offshore employee received.

39.

From time to time, representatives of Old Denbury, including defendant Gareth Roberts, acknowledged that salaries at Denbury Offshore were less than employees could realize at comparable jobs or as competitors of Denbury Offshore, and that the stock options were intended to make up the difference in value. Other plaintiffs understood that the options constituted part of their salaries to compensate them for their below-market cash compensations. In particular, these representations were made when:

10

- Mr. Evans explained to Monnie Greer in 2002, 2003 and 2004, at the time that options were issued to Ms. Greer, that a significant percentage of her annual compensation was in the form of stock options, which was meant to account for her below industry-average salary.

- Representatives of Old Denbury told Gia LePere in 2001 during employment negotiations that part of her salary would be in the form of stock options, which Ms. LePere understood were intended to make up the difference between market rate and her below-industry average salary.

- Defendant Mr. Roberts acknowledged to Thomas Bath during employment negotiations in 2001 that his salary would be far below industry standards but that the overall compensation package of salary, bonus and especially the stock options could be worth much more than an industry standard salary.  Mr. Sinclair made similar representations to Mr. Bath each year from 2001 through 2004 upon the reward of stock options.

- Representatives of Old Denbury told Steve Whitehurst upon his award of options in December 2001 that they were provided as part of his compensation since his salary was below industry average for someone with his level of expertise.

- Mr. Sinclair told Willard Powell upon the award of stock options from 2001 until 2004 that the options were meant to be part of his total compensation, which was well below the industry standard.

- Mr. Evans told Frank Caponegro during employment negotiations that the stock options were meant to account for part of his salary, which was well below the industry standard.

40.

The CEO and other executive officers of Old Denbury made such representations with the intent to create a relationship of trust and confidence between Old Denbury and the employees of Denbury Offshore, to convince the employees of Denbury Offshore to work diligently for the benefit of Denbury Offshore (rather than competing with Denbury Offshore), and to foster a trust and belief on the part of the Denbury Offshore employees that the stock options Old Denbury granted had actual value.

11

41.

Because of these representations, Old Denbury attracted additional employees as the offshore operations grew, retained the profitable services of the plaintiffs, and avoided the effects of increased competition. The plaintiffs relied upon the statements of Old Denbury regarding the stock options in accepting employment with Denbury Offshore and in continuing to be employed by Denbury Offshore. The plaintiffs earned the value of their options every working day.

42.

Use of the stock options was a device that would deter the plaintiffs from leaving the employment of Denbury Offshore and then competing with Denbury Offshore. Each employee was a potential business competitor or was a competent professional who could contribute to the success of a competitor of Denbury Offshore. The incentive to not compete increased each passing year as each plaintiff received additional stock options and the options grew in value.

43.

At or immediately after the end of 2001 and at or immediately after the end of 2002, Old Denbury granted stock options to each Denbury Offshore employee. In each year, Old Denbury presented the grants as a part of the total compensation package for the year's work. In each case, the grants were made through a grant letter in substantially the same form (hereinafter the "Annual Grant Form"), setting out the number of shares subject to the employee's stock option, and the exercise price of the option. A copy of the Annual Grant Form is attached to this petition as **Exhibit C**.

44.

At all times from July 10, 2001 through December 29, 2003, a relationship of trust and confidence existed between Old Denbury and the employees of Denbury Offshore. Old Denbury's corporate management fostered this relationship by frequently visiting with the plaintiffs at Denbury Offshore's St. Tammany parish office.

45.

At all times from July 10, 2001 to December 29, 2003, Old Denbury represented to each plaintiff that participation in the Old Denbury Stock Option Plan allowed each employee to share and participate in the anticipated financial success and increased asset value of Old Denbury that resulted from the acquisition of Matrix, its employees and its assets.

12

46.

In fact, the acquisition of Denbury Offshore yielded substantial economic benefits for Old Denbury. The acquisition caused Old Denbury's average finding costs to decrease substantially, while its oil and gas production and reserves increased. In the second half of 2001, Denbury Offshore drilled, re-completed or sidetracked 12 wells offshore without a single dry hole. According to Old Denbury's SEC filings, during this period alone, the offshore reserves of Denbury Offshore grew by approximately 25%.

47.

The plaintiffs managed the day-to-day operations of Denbury Offshore. They were not only extremely successful in finding oil and gas, but were also able to operate Denbury Offshore in an economically efficient manner. By the end of 2001, Denbury Offshore held interests in 90 wells in the Gulf of Mexico and operated 65 of those wells. The plaintiffs performed all tasks and responsibilities required of them to earn the benefits of the stock options they had been granted.

48.

During 2002, Denbury Offshore increased its average daily production of oil and gas from 2001 levels, despite the impact of Tropical Storm Isodore and Hurricane Lili. Because of the plaintiffs' efforts, Denbury Offshore increased its reserves by 11 billion cubic feet equivalent and operated 68 wells by the end of the year.

49.

From July 10, 2001, when Old Denbury purchased Matrix, until December 29, 2003, when Old Denbury ceased to own Denbury Offshore, Old Denbury's stock price rose approximately 49.5%. During this period, the market value of the outstanding shares of common stock of Old Denbury grew by approximately $250 million. This increase in stock market value was attributable in large part to the efforts of the plaintiffs and the success of Denbury Offshore.

### OLD DENBURY REORGANIZES; DENBURY OFFSHORE BECOMES OWNED BY NEW DENBURY

50.

The terms of the Old Denbury Stock Option Plan (Exhibit A to this petition) applied to all stock options granted by Old Denbury to the plaintiffs.

51.

The Old Denbury Stock Option Plan provided that options would vest immediately if certain conditions were met or events occurred. Among those conditions or events was the occurrence of a "Change in Control" in Old Denbury. Old Denbury defined the term "Change in Control" in its stock option plan.

52.

The Old Denbury Stock Option Plan defined a Change in Control to occur if, among other things, the board of directors of Old Denbury were to change such that a majority of the board members of Old Denbury ceased to be board members of Old Denbury.

53.

The Old Denbury Stock Option Plan further defined and continues to define the term "Change in Control" to occur if any person or entity were to acquire over 50% of the stock of Old Denbury.

54.

Another event that would, pursuant to the terms of the Old Denbury Stock Option Plan, cause all outstanding options to vest immediately with respect to a particular employee would be if the board of directors of Old Denbury were to approve a retirement plan applicable to such an employee, and the employee were to retire under such plan.

55.

The Old Denbury Stock Option Plan also provided that Old Denbury had the authority to modify the vesting provisions of any outstanding option. Accordingly, Old Denbury had the authority to vest options granted to the employees of Denbury Offshore, if Denbury Offshore were sold.

56.

When Mr. Roberts promised to vest all outstanding stock options of the Denbury Offshore employees if Denbury Offshore were sold, he was acting under the apparent authority of Old Denbury, consistent with powers inherent in the Old Denbury Stock Option Plan.

57.

On December 29, 2003, the board of directors of Old Denbury entered into a corporate reorganization under Delaware law (the "Denbury Reorganization"). At the end of the Denbury

Reorganization, which was confected effective on or around December 29, 2003, Old Denbury merged with a limited liability company and ceased to have its own corporate existence.

58.

As a result of the Denbury Reorganization, the Old Denbury Stock Option Plan was transferred to a new company, New Denbury. The new company then changed its name to Denbury Resources, Inc. Also, Mr. Roberts, formerly Chief Executive Officer of Old Denbury, became the Chief Executive Officer of New Denbury.

59.

As a result of the Denbury Reorganization, a majority of Old Denbury's board of directors ceased to be its directors because the company was absorbed by a limited liability company without corporate directors. The board of directors of Old Denbury then became the board of directors of New Denbury, a different entity than Old Denbury.

60.

Insofar as a majority of the board of directors of Old Denbury ceased to be directors of Old Denbury as a result of the Denbury Reorganization, the Denbury Reorganization constituted a "Change in Control" of Old Denbury within the meaning of that term in Old Denbury's Stock Option Plan. Accordingly, upon the consummation of the Denbury Reorganization, the plaintiffs' stock options granted by Old Denbury prior to December 29, 2003 should have become fully vested and immediately exercisable.

61.

Additionally, prior to the Denbury Reorganization, the common stock of Old Denbury was held by thousands of shareholders. After the Denbury Reorganization, all of the equity of Old Denbury was held by a single corporate entity, which was a subsidiary of New Denbury.

62.

Because a majority of the equity of Old Denbury became owned by a single entity, the Denbury Reorganization constituted a "Change in Control" of Old Denbury within the definition of that term in the Old Denbury Stock Option Plan. Accordingly, upon the consummation of the Denbury Reorganization, the plaintiffs' options granted by Old Denbury prior to December 29, 2003 became immediately exercisable in full in accordance with their terms.

63.

Despite the fact that the Denbury Reorganization was a Change in Control of Old Denbury, New Denbury failed to acknowledge that all of the plaintiffs' stock options issued prior to December 29, 2003 became fully exercisable.


### NEW DENBURY GRANTS STOCK OPTIONS TO THE PLAINTIFFS TO RETAIN THEIR SERVICES

64.

New Denbury adopted the Old Denbury Stock Option Plan as its own effective December 29, 2003; thus, the terms of the Old Denbury Stock Option Plan applied to all options granted by New Denbury to the plaintiffs after December 29, 2003.

65.

New Denbury's stock became publicly traded on the New York Stock Exchange on December 29, 2003, and remains publicly traded through the date that plaintiffs filed this lawsuit.

66.

After December 29, 2003, the plaintiffs continued to manage the business of Denbury Offshore with competence and loyalty to its new owner, New Denbury. During the first half of 2004, Denbury Offshore was responsible for about 25% of the total oil and gas production of Old Denbury, on a consolidated basis. In the first 19 days of July 2004 alone, Denbury Offshore produced $5.3 million in operating profits for its owner (after payment of all lease-operating expenses).

67.

In January of 2004, management of New Denbury distributed stock options to the Denbury Offshore employees as payment for their hard work in 2003 and to incentivize them to work hard for, and to not compete against, Denbury Offshore in 2004. Each plaintiff received stock options from New Denbury in January 2004 with the expectation that the options had economic value, as represented to them by representatives of New Denbury.

68.

The plaintiffs' expectation that their options had real value was reasonable. The plaintiffs' relationship with New Denbury was sufficiently trustful. They had no reason to

believe that New Denbury would pay them with stock options that, two months later, New Denbury would claim were just worthless pieces of paper.

69.

At the time New Denbury distributed these options, the plaintiffs were not told that New Denbury intended to sell Denbury Offshore and cancel the options and attempt to render a substantial part of the plaintiffs' compensation worthless.

### NEW DENBURY SELLS DENBURY OFFSHORE AND CANCELS THE PLAINTIFFS' OPTIONS

70.

On or about March 10, 2004, the employees of Denbury Offshore were called into a conference room in their Covington, Louisiana office to meet with Mark A. Worthey, the Senior Vice President Operations of New Denbury. Mr. Worthey told the assembled Denbury Offshore employees that the board of directors of New Denbury had decided to sell Denbury Offshore, and, in connection with the sale, virtually all of their jobs would likely be terminated. Mr. Worthey informed the plaintiffs and their fellow employees of Denbury Offshore that the New Denbury board had considered and approved a plan pursuant to which all plaintiffs would be retired from service with Denbury Offshore. The Denbury Offshore employees were told that they would each be terminated on a case-by-case basis over time prior to the date of sale. New Denbury terminated Mr. Jordan and other Denbury Offshore employees immediately.

71.

At this meeting, one of the Denbury Offshore employees asked Mr. Worthey for assurance that all outstanding stock options would be fully vested as a result of the sale of Denbury Offshore, as promised. Mr. Worthey responded that the options would not be vested; rather, all stock options, including those recently given out, would be canceled. When challenged by some of the plaintiffs on this point, Mr. Worthey said that he would go back to Plano, Texas to discuss the issue with New Denbury management.

72.

From March through July 2004, the plaintiffs were laid off from their jobs at Denbury Offshore. These lay offs (or retirements) were affected pursuant to a plan approved by the board of directors of New Denbury.

17

73.

The lay off of the Denbury Offshore employees pursuant to a plan adopted by New Denbury's board of directors triggered an acceleration of all outstanding stock options under the Old Denbury Stock Option Plan.

74.

On July 20, 2004, Denbury Offshore was sold to Newfield Exploration Company for $200 million.

75.

The sale of Denbury Offshore accelerated the vesting of all employees' stock options as of the date of their termination of employment because Old Denbury, through Mr. Roberts, the Chief Executive Officer of both Old and New Denbury, had promised to vest all options upon any sale of Denbury Offshore. The Denbury Offshore employees relied upon this promise, having performed their obligations by remaining with the company and working hard to build the value of Denbury Offshore.

76.

During the 11 fiscal quarters in which Old Denbury and New Denbury owned Denbury Offshore, the plaintiffs and their fellow employees in Covington, Louisiana managed the day-to-day operations of the business for the Texas owner. When Old Denbury acquired Matrix, Matrix had approximately 11.9 million barrels of oil equivalent. Over the following 11 fiscal quarters, the plaintiffs oversaw the production of approximately 8.27 million barrels of oil equivalent. At the sale, 16 million barrels of oil equivalent remained. Accordingly, in all, Denbury Offshore's employees successfully drilled for or otherwise acquired about 12.37 million barrels of oil equivalent, all while they managed the operation of Denbury Offshore's wells, properties and platforms, including the production of about 8.27 million barrels of oil equivalent. These employees thus built considerable wealth for the owner of Denbury Offshore, motivated in large part by the promise that they would share in a small portion of the gain.

77.

In August 2004, almost immediately after the sale of Denbury Offshore, the board of directors of New Denbury awarded generous stock grants to Messrs. Gareth Roberts, Mark Worthey, Mark Allen, Harold (Ray) Dubuisson, Tracy Evans, Phil Rykhock and Jim Sinclair, along with other members of management. On information and belief, these stock grants were

18

compensation for the tremendous profit that New Denbury had realized on its investment in Denbury Offshore. The following month, the board of directors of New Denbury also awarded itself stock related compensation. The value of these stock grants exceeded $23 million and as of the date that this lawsuit was filed, the shares awarded had a value of approximately $ 33 million.

### FIRST CAUSE OF ACTION

(Damages for Breach of Contract by Virtue of Defendants' Breach of Stock Option Plan)

78.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraph 1 through 77 of this Petition for Damages as though fully set forth.

79.

The stock options granted by Old Denbury and New Denbury to the plaintiffs created contractual rights in the plaintiffs. Those rights were governed by the terms of the Old Denbury Stock Option Plan, which was incorporated by reference into the documentation granting the options.

80.

As of December 29, 2003, each plaintiff had performed all of the conditions, covenants or promises required to be performed by him, or her, to entitle him or her to receive the benefits of full ownership and vesting of all of his or her stock options outstanding on the date of the Denbury Reorganization.

81.

The Denbury Reorganization that took place on or about December 29, 2003, constituted a "Change in Control" under the Old Denbury Stock Option Plan and caused all stock options granted to the plaintiffs prior to December 2003 to vest immediately.

82

Defendant New Denbury breached its contracts with the plaintiffs and defendant Gareth Roberts caused this breach by denying the immediate vesting of the stock options held by the plaintiffs as of December 29, 2003 under the Old Denbury Stock Option Plan, and by repudiating and denying plaintiffs' rights and defendants' own obligations under the contracts.

83.

New Denbury succeeded, by virtue of Delaware law and pursuant to the terms of the Denbury Reorganization, to the contractual obligations of Old Denbury to the plaintiffs.

84.

During the period from July 2001 through July 2004, the Old Denbury Stock Option Plan provided that the plaintiffs' stock options would also immediately vest upon the plaintiffs' retirement pursuant to a plan approved by the New Denbury board of directors.

85.

In 2003 or 2004, the board of directors of New Denbury adopted and approved a plan to sell Denbury Offshore and to retire (or lay off) substantially all of its employees. The plaintiffs were, in fact, retired pursuant to this plan of the New Denbury board of directors.

86.

From March 2004 until July 2004, the period during which New Denbury retired the employees of Denbury Offshore, New Denbury breached its contractual obligations to the plaintiffs by failing and refusing to acknowledge vesting of each plaintiff's stock options under the Old Denbury Stock Option Plan and by denying and repudiating the rights of the plaintiffs under such plan.

87.

As a member of the New Denbury Board of directors, Mr. Roberts knew that the board had adopted a plan to effect retirement of the plaintiffs: his refusal to vest the plaintiffs' stock options has caused an intentional breach of New Denbury's contractual obligations to plaintiffs.

88.

Since the time of the breaches of the Old Denbury Stock Option Plan, the defendants have and continue to repudiate the agreement between the parties and have continued to refuse to honor New Denbury's and Old Denbury's contractual obligations to vest each plaintiff's options granted under the Old Denbury Stock Option Plan.

89.

As a result of the defendants' breach of these contractual obligations, the plaintiffs have suffered, and continue to suffer, damages in amounts subject to proof at trial.

**SECOND CAUSE OF ACTION**

(Breach of Oral Contract for Failure to Honor Agreement to Vest All Options upon
the Sale of Denbury Offshore)

90.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraph 1 through 77
of this Petition for Damages as though fully set forth.

91.

By operation of Delaware law, New Denbury assumed the obligations of Old Denbury
with respect to outstanding options under the Old Denbury Stock Option Plan on the date of the
Denbury Reorganization.

92.

Between July 2001 and January 2004, each plaintiff was granted stock options pursuant
to the Old Denbury Stock Option Plan, in the form attached as Exhibit "A" hereto.

93.

Old Denbury and New Denbury, both orally and through their actions and inactions,
agreed with the plaintiffs that the plaintiffs' stock options vested fully upon the sale of Denbury
Offshore.

94.

The plaintiffs fully performed their obligations to Old Denbury and New Denbury,
entitling the plaintiffs to the full value and vesting of their stock options.

95.

Since the time of this contractual breach, the defendants have continued to repudiate their
obligations to the plaintiffs and have continued to fail to honor and recognize each plaintiff's
right to full vesting of his or her stock options.

96.

As a result of the defendants' breach of New Denbury's oral obligations to the plaintiffs,
each plaintiff has suffered, and continues to suffer, damages in amounts subject to proof at the
time of trial.

21

**THIRD CAUSE OF ACTION**

(Detrimental Reliance)

97.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for Damages as though fully set forth.

98.

Plaintiffs relied to their detriment upon representations made on behalf of Old Denbury and New Denbury to the effect that the stock options given as part of the plaintiff's compensation for services rendered had actual economic value.

99.

The promises were made by the defendants in order to cause the plaintiffs to continue in their employment with Old Denbury and New Denbury and to discourage the plaintiffs from competing against Old Denbury and New Denbury.

100.

The plaintiffs' reliance, supported by this good and valuable cause and coupled with the more than three-year business relationship with defendants, was justified and reasonable.

101.

The plaintiffs' continued employment with, lack of competition against, and motivated work for Old Denbury and New Denbury caused the plaintiffs to justifiably rely upon the defendants to honor their promises, and, when the defendants refused to do so, resulted in substantial injury to the plaintiffs.

102.

Pursuant to La. Civ. Code Art. 1967 (2004), the defendants are liable to the plaintiffs for damages suffered as a result of the plaintiffs' justified reliance on the defendants' promises.

**FOURTH CAUSE OF ACTION**

(Breach of Duty of Good Faith)

103.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for damages as though fully set forth.

22

104.

The defendants' promises to vest the plaintiffs' stock options upon a change in control of Old Denbury, upon the plaintiffs' retirement pursuant to a board approved plan and upon the defendants' sale of Denbury Offshore created a duty of good faith to fulfill these obligations to the plaintiffs.

105.

As an employer, the defendant New Denbury had a duty of good faith to do whatever was necessary to make the plaintiffs' stock options have the economic value that they were represented and promised to have.

106.

As the chief executive officer and as a board member of New Denbury, Mr. Roberts had a duty to cause New Denbury to fulfill its good faith obligations to the plaintiffs.

107.

The defendants' refusal to vest the plaintiffs' stock options breached the defendants' duty of good faith to the plaintiffs and damaged the plaintiffs' interests.

108.

Pursuant to La. Civ. Code Art. 1983 (2004), the plaintiffs are entitled to recover damages of an amount to be proven at trial for defendants' breach of their obligation of good faith.

**FIFTH CAUSE OF ACTION**

(Bad Faith Obligor)

109.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for Damages as though fully set forth.

110.

The defendants caused representatives of New Denbury to deliver stock options to the plaintiffs in January 2004, with knowledge of the plans to sell Denbury Offshore.

111.

At said time, defendants intentionally failed to inform the plaintiffs of the plans to sell Denbury Offshore. Further, defendants failed to tell the plaintiffs at that time that the defendants would dishonor the stock options if the plans to sell Denbury Offshore came to fruition.

23

112.

When the defendants issued the January 2004 stock options, they intended to sell Denbury Offshore and intended to dishonor the stock options.

113.

The defendants consciously and willfully gave the plaintiffs stock options that the defendants secretly planned would be worthless sheets of paper.

114.

Pursuant to La. Civ. Code Art. 1997, the defendants acted in bad faith in breaching both the oral contract to vest the options upon the sale of Denbury Offshore and the stock option plan. and, therefore, the plaintiffs are entitled to damages, foreseeable or not, in an amount provable at trial and attorney's fees.

**SIXTH CAUSE OF ACTION**

(Negligent Misrepresentation)

115.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for Damages as though fully set forth.

116.

The defendants made significant misrepresentations when they (or their representatives acting with apparent authority) stated to the plaintiffs that the stock options would vest if Denbury Offshore were sold.

117.

The defendants made significant misrepresentations when they (or their representatives acting with apparent authority) stated that the only way a plaintiff's options would not vest was if the plaintiff was fired or voluntarily left the employ of Old Denbury or New Denbury.

118.

The defendants or their representatives made misrepresentations when they presented stock options to the plaintiffs in January 2004 as part of the plaintiffs' compensation for work performed and work to be performed.  At the time the defendants made each of these representations, the defendants knew, or in the exercise of reasonable and/or ordinary care, should have known, that the representations were materially inaccurate.

119.

Each of these misrepresentations related to then existing material facts and were materially inaccurate or misleading.

120.

Because the defendants were the employers of the plaintiffs, they had a duty to provide accurate material information regarding Old Denbury, the stock option plan and matters related to compensation for services rendered.

121.

The defendants expected and knew that the plaintiffs would rely on the defendants' materially inaccurate and misleading misrepresentations concerning material facts about the terms of the plaintiffs' employment.

122.

The plaintiffs were unaware of the inaccuracy of the defendants' carelessly and negligently made materially inaccurate representations concerning material facts about the terms of the plaintiffs' employment.

123.

The plaintiffs, as employees of the defendants, reasonably and justifiably relied upon defendants' misrepresentations of the material facts discussed herein.

124.

As a direct and proximate result of these materially inaccurate representations, the plaintiffs sustained damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

(Breach of Fiduciary Duty)

125.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for Damages as though fully set forth.

126.

Based on the employer and employee relationship, mutual oral promises and assurances about work to be performed and the compensation for such work, there existed a relationship of trust and confidence between the defendants and the plaintiffs.

127.

From the date of the purchase of Matrix by Old Denbury until the date of the Denbury Reorganization, there existed a relationship of trust and confidence between Old Denbury and Mr. Roberts, on the one hand, and the plaintiffs, on the other hand.  Old Denbury and Mr. Roberts intentionally created this relationship in order to incentivize the plaintiffs to run Old Denbury's offshore oil and gas business in the best manner possible and in Old Denbury's best interests.

128.

From the date of the Denbury Reorganization through January 2004 (which is the time period during which New Denbury issued additional stock options to the plaintiffs), New Denbury and Mr. Roberts intentionally created a relationship of trust and confidence with the plaintiffs for the purpose of incentivizing the plaintiffs to manage New Denbury's offshore oil and gas business in the best possible manner for the benefit of New Denbury.

129.

This relationship of trust and confidence gave rise to a *de facto* fiduciary relationship between the plaintiffs and the defendants, particularly insofar as the relationship involved compensation promised for the services rendered by the plaintiffs.

130.

The defendants breached their fiduciary duty to the plaintiffs by intentionally engaging in the following wrongful acts:

(a)     Granting stock options to plaintiffs in 2004 in payment for services rendered and to be rendered by the plaintiffs, even though New Denbury was planning to sell Denbury Offshore and cancel said options.

(b)     Promising plaintiffs that all stock options would vest if Denbury Offshore were sold, thereby inducing the plaintiffs' labor, when New Denbury all the while intended to repudiate its obligations to vest the stock options.

(c)     Falsely convincing the plaintiffs to accept stock options in lieu of cash compensation, when New Denbury intended to repudiate its obligations with respect to said stock options.

(d)     Misrepresenting to the plaintiffs that participation in the Old Denbury Stock Option Plan would allow the plaintiffs to share and participate in the financial success and

increased asset value of Denbury Offshore, when executive officers and directors of Old Denbury anticipated that only they would participate in such increase in asset value.

131.

As a result of the defendants' breach of their *de facto* fiduciary duty to the plaintiffs, the plaintiffs have suffered damages subject to proof at trial.

## EIGHTH CAUSE OF ACTION

(Wages Due)

132.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for Damages as though fully set forth.

133.

During the course of his or her employment, each plaintiff provided the services and labor required of such plaintiff by his or her job. The plaintiffs provided those services and labor with such competence that Old Denbury and New Denbury, as owners of Denbury Offshore, realized substantial economic gain during the time that they owned Denbury Offshore and in connection with the sale of Denbury Offshore. Accordingly, the plaintiffs earned their right to be compensated for their services and labor.

134.

The stock options granted to the plaintiffs by Old Denbury and New Denbury accounted for a substantial part of the plaintiffs' total compensation. Accordingly, the plaintiffs accepted low salaries and bonuses with the understanding that they would receive stock options in lieu of additional cash compensation.

135.

From time to time, representatives of Old Denbury acknowledged that the plaintiffs' cash salaries were well below the industry standard, but that the stock options granted to the plaintiffs were intended to make up the difference.

136.

Old Denbury, New Denbury and Mr. Roberts represented to the plaintiffs that the stock options granted under the Old Denbury Stock Option Plan were part of the total compensation package for the employees of Denbury Offshore.

137.

Old Denbury and New Denbury used the Old Denbury Stock Option Plan to retain, attract, motivate and compensate employees, and to save cash that would otherwise have to be paid in salaries.

138.

These stock options constitute wages under La. Rev. Stat. § 23:631 (2004).

139.

The Old Denbury Stock Option Plan was part and parcel of the employment relationship between Old Denbury and New Denbury, on the one hand, and the plaintiffs on the other hand, and constituted "wages" under Louisiana law.

140.

Since the time of the discharge of the plaintiffs, the defendants continue to repudiate their obligations to pay such wages to the plaintiffs and have continued to fail and refused to honor and recognize each plaintiff's right to vesting of his or her stock options.

141.

The defendants are currently in default over these unpaid wages, as fifteen days has elapsed since the discharge of each of the plaintiffs.

142.

Pursuant to La. Rev. Stat. §§ 23:631 and 23:632 (2004), the plaintiffs are entitled to unpaid wages, penalty wages and reasonable attorney fees to be proven at trial.


**NINTH CAUSE OF ACTION**

(Louisiana Unfair Trade Practices Act)

143.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for damages as though fully set forth.

144.

The defendants committed unfair or deceptive acts or practices in the conduct of trade by intentionally and knowingly engaging in the following unfair acts:

(a)     Granting stock options to plaintiffs in 2004 even though New Denbury planned to sell Denbury Offshore and to cancel such options as a result of the sale.

(b)      Falsely promising the plaintiffs that all of their stock options would vest if Denbury Offshore were sold in order to discourage competition.

(c)      Falsely inducing the plaintiffs to believe that the stock options they were receiving had actual economic value and would lose such value only if the plaintiffs were fired or voluntarily left their employ, thereby inducing competitors to work, instead, for the benefit of Old Denbury and New Denbury.

(d)      Misrepresenting to the plaintiffs that accepting stock options in lieu of cash compensation would allow the plaintiffs to share and participate in the financial success and increased asset value of Denbury Offshore.

(e)      Deriving a profit by inducing the plaintiffs to work for stock options that it did not intend to vest.

(f)      Retaining, recruiting and motivating employees of Denbury Offshore by misrepresentations about the vesting of their stock options.

(g)      Through misrepresentations convincing the plaintiffs to not compete with Denbury Offshore, but rather to help Denbury Offshore in its business.

145.

By their unfair trade practices, New Denbury and Mr. Roberts intended to thwart competition, as the plaintiffs were potential competitors to New Denbury and Denbury Offshore.

146.

The plaintiffs have suffered, and continue to suffer, damages caused by the defendants' unfair methods, acts and trade practices.  Pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. §§ 51:1401-51:1421 (2004), the plaintiffs are entitled to treble damages, attorney fees and costs.

**TENTH CAUSE OF ACTION**

(Unjust Enrichment)

147.

Plaintiffs re-allege and incorporate herein all of the allegations of Paragraphs 1 through 77 of this Petition for Damages as though fully set forth.

29

148.

The defendants' actions as described hereinabove caused the defendants to be enriched at the expense of the plaintiffs without justification or cause and, as such, constitute an unjust enrichment.

149.

The defendants' refusal to vest the stock options pursuant to the Old Denbury Stock Option Plan's terms and promises made by the defendants, has enriched defendant New Denbury and its predecessor company to the extent that Old Denbury and New Denbury were able to hire labor below market value, lower the level of competition, and maintain a highly motivated work force, all of which resulted in substantial profit to Old Denbury and New Denbury.

150.

Defendant Gareth Roberts was awarded a large bonus in the form of a stock grant worth multiple millions of dollars (approximately $7.5 million at February 10, 2005) soon after the sale of Denbury Offshore. By this stock grant, Mr. Roberts was enriched as a result of the plaintiffs' hard work, when the plaintiffs were denied their fair wages.

151.

The plaintiffs have been impoverished to the extent that they were paid below market value and denied their fair share of the fruits of their labor.

152.

There is a direct correlation between plaintiffs' impoverishment and defendants' enrichment, as without plaintiffs' impoverishment (the unpaid value of their contributions to the defendants, and the amounts the plaintiffs could have made as competitors), the profits Old Denbury and New Denbury realized from the sale and operation of Denbury Offshore and the bonus received by Mr. Roberts would have been substantially reduced.

153.

For defendants' wrongful acts and/or omissions resulting in their unjust enrichment and pursuant to La. Civ. Code Art. 2298 (2004), plaintiffs are entitled in equity to recover compensation to be proven at trial.

## REQUEST FOR TRIAL BY JURY

154.

As a result of the breaches of contract and fiduciary duty, the breaches of Louisiana law related to the payment of wages and the Louisiana Unfair Trade Practice Act, negligent misrepresentations and unjust enrichment, the plaintiffs are entitled to, and hereby request, a trial by jury.

WHEREFORE, the plaintiffs pray that the defendants, Denbury Resources, Inc. and Mr. Gareth Roberts, Chief Executive Officer thereof, be served with a copy of this pleading, and that the defendants be duly cited to appear and answer same; and that after all legal delays and due proceedings be had, there be judgment herein in favor of the plaintiffs against the defendants, in amounts to be determined by a jury, taking into consideration the inherent tax benefit derived from incentive options, which amounts should be trebled by virtue of the defendant's violations of Louisiana law, with legal interest from judicial demand hereon until paid, and for attorney fees, court costs and all applicable penalties and costs of these proceedings and for any other relief deemed just and equitable.

Respectfully submitted,

ADAMS AND REESE LLP

ROBERT VOSBEIN (#13129)
MARK BEEBE (#19478)
VIRGINIA BOULET (#01723)
4500 One Shell Square
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
*Attorneys for Monnie Greer, et. al.*

PLEASE HOLD SERVICE:

A TRUE COPY
DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET



05-0082

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Monnie Greer, et al

## DEFENDANTS
Denbury Resources, Inc + Gareth Roberts

(b) County of Residence of First Listed Plaintiff **Orleans**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Texas**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Robert Vosbein
Adams + Reese
4500 One Shell Square
New Orleans, LA 70139

Attorneys (If Known)
Alan H. Goodman
Thomas M. Benjamin
1601 Poydras St #2100
N.O, LA 70130

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | **PERSONAL PROPERTY** | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | ☐ 370 Other Fraud | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 380 Other Personal Property Damage | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 385 Property Damage Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 441 Voting | **PRISONER PETITIONS** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 444 Welfare | ☐ 530 General | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC §§ 1441, 1446 and 1332
Brief description of cause:
Breach of contract dispute

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ over $75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions) JUDGE _____ DOCKET NUMBER _____

DATE 3/2/05

SIGNATURE OF ATTORNEY OF RECORD
Thomas M. Benjamin

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____