UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MONNIE GREET ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 05-0682** |
| **DENBURY RESOURCES, INC. AND GARETH ROBERTS** | **SECTION: "S" (1)** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### I. BACKGROUND

The plaintiffs [1] are former employees of Denbury Resources, Inc. (Old Denbury), who performed services in the offshore oil and gas industry for a subsidiary, Denbury Offshore, Inc. (Offshore), in Covington, Louisiana. Old Denbury purchased Matrix Oil and Gas Company on July 10, 2001 and renamed it Offshore. Old Denbury retained Matrix's managers and employees, some of whom are the plaintiffs, and offered them an opportunity to share in Offshore's profits through stock options. The plaintiffs received stock options under Old

---

[1] The plaintiffs are Monnie Greer, a reservoir engineer; Kevin Jordan, an oil scout; Steve Freeman, a production engineer; Gia LePere, a regulatory specialist; Steven C. Whitehurst, a production engineer; Bernard Hagstette, a purchasing manager; Willard Powell, a geologist; Frank W. Currow, Jr., a senior geophysicist; Frank Caponegro, a senior reservoir engineer; Edward M. Schehr, Jr., a petroleum geologist; Thomas Bath, a geological consultant; and Alice Caminita, an assistant engineering technician/records clerk.

Denbury's "Stock Option Plan" as documented in the "Incentive Stock Option Agreements." Each stock option would vest and could be exercised at a designated time.

On December 29, 2003, the board of directors of Old Denbury reorganized the corporation. Old Denbury formed a new subsidiary, Denbury Holdings, Inc. (Holdings). Holdings formed a new subsidiary, Denbury Onshore, LLC (Onshore). Onshore had a Board of Managers, not a Board of Directors, and the Board of Managers had only one member who was a director of Old Denbury. Old Denbury merged into and survived as Onshore. Holdings changed its named to Denbury Resources, Inc. (New Denbury). The shareholders of Old Denbury received 100% of the shares in New Denbury, and the board of directors of Old Denbury became the board of directors of New Denbury. The Old Denbury "Stock Option Plan" was transferred to New Denbury.

On March 10, 2004, the Offshore employees were advised that the New Denbury Board of Directors had decided to sell Offshore, and all of the plaintiffs' positions with Offshore would phase out between March and July 2004. The plaintiffs received severance pay and were able to exercise stock options that had vested as of the date of termination. Unvested stock options were canceled as the plaintiffs' employment ended.

On February 11, 2005, the plaintiffs filed a petition for damages in Civil District Court for the Parish of Orleans, State of Louisiana, against Denbury and Gareth Roberts, the President and Chief Executive Officer of Denbury, to recover the value of all stock options lost as a result of the reorganization and resulting lay-off plan, and for a declaration that the outstanding stock

options became vested under the change of control provision of the Plan.[2]  On May 11, 2005, after the filing of this suit, the Compensation Committee met and determined that the December 2003 reorganization did not constitute a change of control of the corporation that would trigger the vesting of the plaintiffs' outstanding stock options.  The defendants removed the case to federal court.

The case proceeded to trial before the court on June 1, 2006, on the sole issue of whether the December 29, 2003 corporate reorganization constituted a change of control within the meaning of Denbury's Stock Option Plan.

## II. DISCUSSION

The plaintiffs contend that the reorganization of Old Denbury was a change of control because Old Denbury became Onshore, not New Denbury; 100% of the equity was transferred to Onshore; and the Board of Directors of Old Denbury ceased to constitute a majority because Onshore's Board of Managers had only one director of Old Denbury.  The plaintiffs argue that Denbury breached its contract under the Stock Option Plan and the Stock Option Agreements by refusing to recognize their stock options as vesting upon the December 2003 reorganization. The issue is whether the reorganization was a change of control, as defined in Section 10 of the Stock Option Plan, that resulted in the vesting of the plaintiff's stock options that had not yet vested.

---

[2] In February 2005, Denbury filed a complaint for declaratory judgment in the United States District Court for the Eastern District of Texas.  Denbury dismissed the case without prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1), on May 24, 2005, when the present case was removed to federal court.  Def.'s exh. 18.

The case before the court is one of contract interpretation.[3]  The interpretation of the language of a contract is a matter of law.  See Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).  "Where the language is clear and unambiguous, the court will accord that language its ordinary meaning."  Council of Dorset Condominium Apartments v. Gordon, 801 A.2d 1, 5 (Del. 2002).  The court may consider "the overall purpose of the contracts and of the specific provisions at issue."  Playtex FP, Inc. v. Columbia Casualty Co., 622 A.2d 1074, 1076 (Del. Sup.Ct.1992) (citing Continental Casualty Co. v. Ocean Accident and Guarantee Corp., 209 A.2d 743, 751 (Del. 1965).  "An understanding of the industry is also important to an intelligent interpretation of the meaning of the contract."  Id.  Because the case is one of contract interpretation, it is unnecessary to afford deference to the decision of the Compensation Committee.  See Fischbein v. First Chicago NBD Corp., 161 F.3d 1104, 1105 (7th Cir. 1998) (change of control case in which deference from the courts found to be unnecessary under Delaware law).

**A.  Stock Option Plan and Incentive Stock Option Agreements**

As in all contractual disputes, the analysis begins with the agreement between the parties.  The Board of Directors established a Stock Option Plan for the purpose of providing incentives to employees, attracting and retaining personnel, compensating independent contractors, and furthering the identity of the employees with that of the shareholders.  See Def.'s exh.2.

An "Incentive Stock Option Agreement" between Denbury and an employee grants to the

---

[3]  This case is not governed by the Employee Retirement Income Security Act (ERISA); therefore, the terms of the contract are interpreted under the appropriate state contract law.  Prior to trial, the court determined that Delaware contract law applies.

optionee an option to purchase a certain number of common shares, an expiration date, the purchase price per share, and the vesting date or dates of the shares.  Id.  The vesting date is the date on which the right to purchase a certain percentage of the awarded shares shall be exercisable.  The expiration date is the date upon which an option shall terminate if the shares have not been purchased.  Id.

Notwithstanding the vesting date, under the Plan, stock options will vest on the date immediately preceding a change of control.  Id.  Section 10 of the Stock Option Plan, "Vesting on Change of Control," provides that a change of control of the corporation occurs under the following events and circumstances:

> a. the purchase or acquisition of Common Shares or other securities capable of becoming voting securities . . . by a Person . . . which results in the Person beneficially owning, or exercising control or direction over, Common Shares or Convertible Securities such that, assuming only the conversion of Convertible Securities beneficially owned or over which control or direction is exercised by the Person, the Person would beneficially own or exercise control or direction over, Common Shares carrying the right to cast more than 50% of the votes attaching to all Common Shares; or
>
> b. directors serving in such capacity for one (1) year or more ceasing to constitute a majority of the Board of Directors; or
>
> c. approval by the shareholders of the Corporation of: (I) an amalgamation, arrangement, merger or other consolidation or combination of the Corporation with another corporation pursuant to which the shareholders of the Corporation immediately thereafter do not own share os the successor or continuing corporation which would entitle them to cast more than 50% of the votes attaching to all shares in the capital of the successor or continuing corporation which may be cast to elect directors of that corporation; (ii) the liquidation, dissolution or winding-up of the Corporation; or (iii) the sale, lease or other disposition of all or substantially all of the assets of the Corporation.

See Def.'s exh.2.[4]  Under the original Plan, the following language appeared at the end of section (a):

> unless such transaction has been approved by a majority of those incumbent directors who have served in such capacity for one year or more.

The following language appeared in section (b):

> unless the change in the constitution of the board of directors of the Corporation has been approved by a majority of those incumbent directors who have served in such capacity for (1) year or more.

Thus, the original Plan contained a "safe harbor" provision which could have clearly excluded this reorganization from the definition of change of control.

Case law instructs on reasons for including provisions for change of control.  "There are two principal purposes (other than deterring potential raiders) for putting a 'Change in Control' provision in an employee benefit plan.  The first is to assure employees that they will be paid in the event of a takeover by depriving a raider of the power to prevent payment.  The second is to insure that key employees will be able to focus on their jobs during the hectic period associated with a potential takeover, rather than having to worry about how they will pay their bills if they lose their jobs."  Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286, 295 n.18 (5th Cir. 1998) (ERISA case involving a change of control provision) (internal quotation and citation

---

[4] Phil Rykhoek, a senior vice-president and chief financial officer, testified that the language was included in the 1995 version because, at that time, Texas Pacific purchased approximately 50% of Denbury stock.  Under the 1995 language, no change of control would occur as a result of Texas Pacific's investment.  As part of an amendment to the overall Plan in 2000, section 10 was amended to remove the language related to the Texas Pacific transaction, which was no longer necessary.  In 2004, the Plan was again amended to include the "safe harbor" provision.

omitted).

**B. Minutes of the Compensation Committee Meeting**

On May 11, 2005, the Compensation Committee met to consider claims that the plaintiffs' stock options vested upon the reorganization of Denbury.[5] The Compensation Committee consisted of Ron Greene, chairman of the Compensation Committee and member of the Board of Directors; Greg McMichael; and Don Wolf. Rykhoek and Don Brodsky, the lead counsel on the reorganization, were present by invitation. See Def.'s trial exh. 3.

Greene reported that there was no intent that the reorganization effectuate a change of control. The primary objection of the reorganization was to create a subsidiary LLC in Louisiana that would provide tax savings and economic efficiencies to Denbury. There was no change in shareholders or membership of the Board of Directors because of the reorganization. Wolf commented that the language of Section 10 "is fairly typical, and is intended to apply to a

---

[5] Willard Powell wrote to Gareth Roberts on April 21, 2004, requesting that his options vest. On April 29, 2004, Brodsky denied Powell's request on behalf of Denbury. On May 19, 2004, Monnie Greer requested that Denbury exercise all of her remaining options, but Roberts did not respond. On June 3, 2004, Frank Currow requested that Denbury exercise his options, but Roberts did not respond. Roberts testified that he did not respond to the plaintiffs' letters, but he talked to them repeatedly. The remaining eight plaintiffs did not communicate with Denbury before filing the lawsuit.

Rykhoek testified that his understanding of the plaintiffs' correspondence was that they were alleging a change of control because of the sale of Offshore, not because of the reorganization of Denbury. Rykhoek did not think "it was a close call" to be taken to the Compensation Committee because the Stock Option Plan refers to the sale of Denbury, not Offshore. He stated that the issue would definitely have been presented to the Compensation Committee at that time if the plaintiffs had requested it. Greene had a different interpretation of the letters and concluded that the plaintiffs were raising the issue of whether the reorganization was a change of control.

public company being taken over by an outside third party on either a friendly or a hostile basis, whereas in this case, the Reorganization was just a realignment of subsidiaries within the same consolidated corporate enterprise." Id. at 2.

**C.  Was there a change of control under Section 10?**

**1.  Section 10(a)–purchase or acquisition of common shares**

The plaintiffs contend that, because there was an acquisition under section 10(a), a change of control was triggered.  The plaintiffs argue that Onshore was the surviving entity of the merger and that the shareholders of New Denbury acquired the shares of Old Denbury when it acquired the membership interests in Onshore.  Denbury contends that there was no purchase or acquisition of any stock as part of the merger and that the stock of Old Denbury was "converted" on a one for one basis into stock of New Denbury as mandated under Delaware corporate law, 8 Del. C. § 251(g).

On December 22, 2003, Old Denbury; Denbury Holdings, Inc., a wholly-owned subsidiary of Old Denbury; New Denbury; and Merger Sub (Onshore), a wholly owned subsidiary of New Denbury, executed an "Agreement and Plan of Merger to Form Holding Company," pursuant to Section 18-209 of the Limited Liability Company Act of the State of Delaware and Section 251(g) of the General Corporation Law.  See Def.'s exh. 1.  Under the agreement, "the designations, rights, powers and preferences, and the qualifications, limitations and restrictions thereof, of respectively the New Denbury Common Stock and the New Denbury Preferred Stock are the same as those of respectively the Old Denbury Common Stock and the Old Denbury Preferred Stock." Id.  The Board of Directors of Old Denbury effected "the

formation of a holding company structure whereby Merger Sub, as the survivor of a merger between Old Denbury and Merger Sub will, immediately after the merger, be the wholly-owned subsidiary of New Denbury and the stockholders of Old Denbury will become the stockholders of New Denbury." Id.  The Boards of Directors of Old Denbury and New Denbury, the Board of Managers of Merger Sub, Old Denbury as the sole stockholder of New Denbury, and New Denbury as the sole member of Merger Sub, "approved the merger of Old Denbury into Merger Sub, the conversion of shares of Old Denbury Common Stock into shares of New Denbury Common Stock." Id.

Article I, section 1.1(b)(1) of the merger agreement provides, pursuant to Section 251(g), that

> each issued and outstanding share of Old Denbury Common Stock shall be converted into one issued and outstanding share of New Denbury Common Stock, having the same designations, rights, powers and preferences, and the qualifications, limitations and restrictions thereof, as the converted share of Old Denbury Common Stock.

Id.  New Denbury was deemed a "successor issuer" under the Securities Act of 1933 and the merger was intended to qualify as a tax-free reorganization under section 368(a) of the Code.  Id. at Section 1.3.  At the Effective, the name of New Denbury became Denbury Resources, Inc, the same name as the corporate name of Old Denbury immediately prior to the Effective Time.  Id. at Section 1.8(a).  In accord with section 251(g), "each outstanding certificate that, immediately prior to the Effective Time, evidenced shares of issued Old Denbury Common Stock shall be deemed and treated for all corporate purposes to evidence the ownership of the numbers of shares of issued New Denbury Common Stock into which such shares of Old Denbury Common

Stock are converted . . ., and the New Denbury Common Stock into which the Old Denbury Common Stock is converted . . . shall be represented by the same stock certificates that previously represented such Old Denbury Common Stock." Id.

Ten days prior to merger, on December 19, 2003, the Board of Directors of Old Denbury adopted resolutions (I) approving the transfer of all benefit plans of Old Denbury, including the Stock Option Plan, to New Denbury; (ii) transferring all benefit Plans to New Denbury; (iii) changing New Denbury's corporate name to Denbury Resources, Inc.; and (iv) authorizing the proper officers of Old Denbury to sign all documents to evidence the transfer of the benefit plans. See Def.'s exh. 41. In separate resolutions that mirrored Old Denbury's resolutions, New Denbury consented to and approved the transfer of the benefit plans. See Def.'s exh. 42. The resolutions specifically provide that all references in each and every Benefit Plan to Denbury Resources, Inc. shall mean New Denbury in place of Old Denbury. Id. On December 22, 2003, the managers and sole member of Onshore approved and adopted the merger agreement in all respects by unanimous consent. See Def.'s exh. 46.

Brodsky testified that there was no sale, transfer, or exchange of stock, but a conversion under Delaware law. He stated that the conversion language in the merger agreement conforms with section 215(g). According to Brodsky, this was a technical reorganization of the entities, and there were no third parties involved. The New York Stock Exchange approved the transaction, the listing on the New York Stock Exchange followed the converted shares, and the shares traded under the same symbol prior to and after the Effective Time.

Gareth Roberts testified that there was never any discussion or suggestion that the

10

reorganization was a change of control. Roberts described the reorganization as a non-event about which most employees were probably unaware. Roberts testified that everything remained exactly the same, and his stock certificates remained in his safe. He stated that the Securities Exchange Commission and the New York Stock Exchange would have to know if there was a change of control.

Defendants' expert on Delaware law, Franklin Bolotti, opined that section 251(g) requires, as a matter of policy, that shareholders end up in the same position as they were before the reorganization. According to Bolotti, the stock of Old Denbury vanished or ceased to exist, and the same shareholders held stock of New Denbury. He testified that, because section 251(g) allows the conversion to go forward without a vote of the shareholders, there can be no purchase or acquisition, and everything must stay the same.

Professor Anthony Correro, plaintiffs' expert, discussed the concept of a "shell" merger, involving Old Denbury and Onshore as the merging parties and Onshore as the "survivor" of the merger. Professor Correro stated that, at the end of the process, New Denbury is owned by the former shareholders of Old Denbury. He placed no importance on why the action was taken, but focused on the language of section 10 and contract law. Professor Correro opined that there was a change of control under the language of sections 10(a) and 10(b) for the following reasons:

– Denbury became the LLC, or, put another way, the LLC became Denbury
– New Denbury acquired 100% of the voting securities of Old Denbury
– The managing body of the LLC became the managing body of Denbury, and the    directors of Old Denbury were no longer directors.

A merger between or among Delaware corporations is a corporate act. Shields v. Shields,

498 A.2d 161, 167 (Ch. Del. 1985). "When duly effectuated, such a corporate act effects by operation of law a transmutation of the stock interest in a constituent corporation." Id. (citing 8 Del.C. § 251). "At the moment a stock for stock merger is effective, the stock in a constituent corporation (other than the surviving corporation) ceases to exist legally. The subject matter of the stockholders' agreement thus vanishes, so to speak, at that point and its place is taken by a stock interest in another, distinct corporation." Id. at 168. "In corporate law, little or nothing turns on who is denominated the 'survivor' in a merger." See Fischbein v. First Chicago NBD Corp., 161 F.3d 1104, 1105 (7th Cir. 1998). The designation is unrelated to any purpose that can be assigned to the change of control provision in the Plan. Id.

 Under the facts of this case and the clear language of section 10(a) of the Stock Option Plan, there was no change of control that triggered the vesting of stock options which were granted to the plaintiffs, but had not yet vested. No stock was "purchased or acquired" by any person as part of the merger. As of the effective time of the merger, each outstanding share of Old Denbury Common Stock was converted to one outstanding share of New Denbury Common Stock. A shareholder who owned a certain number of shares of Old Denbury before the merger owned the same number of shares of New Denbury immediately after the merger, and there was no requirement for the surrender and exchange of the stock certificates. No new shareholders owned or exercised control over shares carrying the right to cast more that 50% of the votes. Onshore did not acquire any of the shares of Old Denbury, and the fact that Onshore was designated as the surviving entity has no effect for purposes of section 10(a). After the merger, the "Incentive Stock Option Agreements" awarded to each of the plaintiffs were still in force,

including the terms governing vesting and termination.

### 2. Section 10(b)–directors serving for one year or more ceasing to constitute a majority

The plaintiffs additionally contend that a change of control occurred under section 10(b) because there was a change in the majority of the corporation's Board of Directors. The plaintiffs argue that the Board of the surviving entity, Onshore, is vastly different from the Board of Old Denbury prior to the merger because only one director, Roberts, served on both Boards.

"A change of corporate control takes place when a majority of the corporation's existing directors are replaced." Fischbein, 161 F.3d at 1105. In Fischbein, the plaintiffs participated in a stock incentive plan of their employer, First Chicago Corporation, which gave them stock options that could be exercised at specific dates if they were still employed by the corporation. See 161 F.3d at 1104. In 1995, First Chicago merged with NBD corporation, the surviving corporation (renamed First Chicago NBD Corporation). Id. The merger agreement provided that the shareholders would own 51% of the corporation's stock and would elect a majority of the board of directors. Id. After the merger, the plaintiffs were terminated and were not permitted to exercise their stock options because the exercise date had not arrived. Id. The plaintiffs alleged that there was a change of control of First Chicago that made the options exercisable immediately. Id. The Court of Appeals found that there was no change of control because the majority of the corporation's existing directors were not replaced. The same people who controlled the assets and the business before the merger controlled those assets and business after the merger. Id. at 1105. "Their control was not loosened by the fact that the pool of assets

had grown and that the charter and bylaws that the directors were operating under had changed because NBD Bancorp's charter and bylaws were different from First Chicago's." Id.

The absence of a change of control in this case is even stronger than in Fischbein. The reorganization was internal and did not involve another corporation. Onshore, New Denbury, and Old Denbury agreed on the plan of merger to form the holding company to effect the restructuring simultaneously at the Effective time, 9:00 a.m. local time in the State of Delaware on December 29, 2003. See Def.'s exh. 41 at 2. There was no moment when Onshore or its Board of Managers had control of the corporation. Under section 1.5 of the Agreement and Plan of Merger to Form Holding Company, "[t]he directors of Old Denbury immediately prior to the Effective Time will be and remain the directors of New Denbury until the earlier of their resignation or removal or until their respective successors are qualified and either duly appointed or elected in accordance with the Certificate of Incorporation and Bylaws of New Denbury and applicable law." The same eight individuals who served on the Board of Directors of Old Denbury, one minute before the Effective Time of the merger, served as the directors of New Denbury at the Effective Time of the merger and controlled the assets and the business of the corporation. Accordingly, a change of control did not occur under section 10(b).

### III. CONCLUSION

The December 2003 reorganization of Old Denbury did not constitute a change of control that would trigger the vesting of unvested stock options that had been granted to the plaintiffs under the Incentive Stock Option Agreements.

New Orleans, Louisiana, this  25th   day of August, 2006.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**